**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| Garnet O'Marrow and Clarence Gardner | ) | |
| Plaintiff | ) | C.A. No. 6808-MA |
| | ) | |
| v. | ) | |
| | ) | |
| Dean P. Roles, Jr. d/b/a D&M Training | ) | |
| Defendant | ) | |

**MASTER'S REPORT**

Date Submitted:  November 17, 2014
Draft Report:  March 31, 2015
Final Report:  September 30, 2015

This case involves a dispute between two landowners concerning the construction of a large barn on one of the owner's parcel.  Plaintiff Garnett O'Marrow and Defendant Dean Roles, Jr. both reside and raise horses on Heritage Farm Road, a private road in Bridgeville, Delaware.  Both parcels are improved by barns, run-in sheds, and sun shelters that are used for their horses.  In 2012, plaintiff and another party, now deceased, unsuccessfully sought a temporary restraining order of this Court to prevent the defendant from erecting a large fabric-covered barn on his parcel.  Pending before me is plaintiff's request for a permanent injunction seeking the removal of this barn from defendant's property as a violation of the restrictive covenants governing the Heritage Farm Association (hereinafter "the HFA").  This is my draft report following a trial and post-trial

briefing. For the reasons that follow, I recommend that O'Marrow's request for a permanent injunction be denied.

## Factual Background

To understand the arguments that have been raised in this case, it is easier first to describe what HFA is not, rather than what it is. HFA is not a recorded subdivision in Sussex County. There is no plot plan, recorded or otherwise, showing the numbered lots within HFA. Instead, HFA consists of several parcels of land along a private road near Bridgeville.[1] These parcels were created by Donald Booth, Sr. in separate out-conveyances from lands he owned on the southwesterly side of County Route 531.[2] Booth apparently was a jack-of-all-trades; he bred, raised, and trained horses, and operated a glass and metal fabricating business on two large parcels of land. Parcel A, which contained approximately 26 acres, was improved by a two-story barn, a sun shelter, and a run-in shed for Booth's horses. Booth's home, in-ground swimming pool, and several accessory buildings were also located toward the rear of Parcel A. Parcel B, which contained approximately 24 acres, was improved by a large building near Route 531 where Booth operated his fabricating business, and another large barn and a run-in shed. The private road straddled the boundary line between Parcels A

---

[1] Joint Trial Exhibit ("JTX") 30.
[2] JTX 1.

and B along a 50 feet-wide easement running from Route 531 most of the way to the rear of Booth's lands.

On August 13, 1987, Booth conveyed approximately nine acres in Parcel A abutting the private road and Route 531 to Joseph Mangone and his wife.[3] The Mangones' deed contains the following five covenants running with the land:

1.  All homes shall have a minimum square footage of floor area of 1500 for a 1 story; 1800 square feet for a 2 story and 1600 square feet for a split level dwelling, exclusive of all porches, breezeways, carports, garages, terraces, stoops and the like.
2.  No poultry or hog farms shall be permitted.
3.  No trailers or mobile homes or other temporary structure of any kind shall be erected on or moved to any parcel.
4.  Each parcel owner shall provide receptacles for garbage in a screened area not generally visible from any street or road.
5.  It shall be the responsibility of each parcel owner to prevent the development of any unclean, unsightly or unkept conditions of buildings or grounds which shall tend to substantially decrease the beauty of the neighborhood as a whole or the beauty of a specific area.[4]

On November 29, 1988, Booth conveyed approximately 9.5 acres in Parcel A along the private road between Mangones' property line and a new property line near Booth's residence to Garnet O'Marrow and his wife.[5] The O'Marrows' deed contains 27 restrictive covenants, the relevant ones being:

Paragraph 1: Each parcel or given land area located at Heritage Farm Association (hereinafter to be referred to as HFA), shall be solely and exclusively used for residential purposes. No structure improvements,

---

[3] JTX 2.
[4] *Id.*
[5] JTX 9 & 10.

except as hereinafter provided, shall be erected, altered, placed, used or permitted to remain upon any such numbered parcel thereof.

Paragraph 2: HFA is hereby established as a restrictive development or neighborhood for single family detached dwellings. For the purposes of these Restrictions, the word "family" shall mean a single person occupying the dwelling unit and maintaining a household; two or more persons related by blood or marriage or adoption occupying a dwelling, living together and maintaining a common household; not more than three (3) unrelated persons occupying a dwelling, living together maintaining a common household.

Paragraph 6: An accessory building being a subordinate building the use of which is customarily incidental to that of any principal building and is used for an accessory use and is located upon the same parcel as the single family dwelling may also be constructed upon each numbered parcel. The accessory building shall not exceed one story in height and shall be solely in connection with the single family dwelling, except with final approval of HFA.

Paragraph 12: No structure of any temporary character and no shack, or other outbuildings, except as provided herein shall be placed on any numbered parcel within HFA at any time except during periods of construction for storage of materials and such temporary structures for storage of materials shall not in any event be used for living quarters.

Paragraph 16: The roads shown on the plot of HFA are hereby dedicated for the use of the residents and property owners of HFA and each such resident and property owner of HFA who needs or wants access to the road by the acceptance of a conveyance of a parcel or parcels in HFA hereby agree to assume the responsibility of maintaining, repairing and replacing that part of the road in front of their parcel or parcels on a per parcel served basis.

Paragraph 17: (a) Every person who acquired title, legal or equitable, and any parcel in HFA shall become a member of HFA Property Owners Association.

(b) The general purpose of the Association is to further and promote this community welfare of property owners in HFA.

(c) The Association shall also be the means for the promulgation and enforcement of all regulations necessary to the governing of HFA.

(d) The Association shall have all the powers vested in it by operation of law. The Association shall be governed by a Board of Governors of not less than 2 members, all of whom shall be property owners in HFA. Each parcel shall have one membership.

Paragraph 18: Each parcel owner in HFA who has use of access road, covenants to pay to HFA Property Owners Association, and its successors, January 1, 1989, and on January 1 of each year thereafter, a maintenance assessment, such assessment to be Two Hundred Fifty Dollars ($250.00) per lot for the calendar year 1989 and such assessment thereafter to be determined by the Board of Governors of HFA Property Owners Association shall be used and expended by it for the construction and/or maintenance of streets, walkways, lighting for street, and similar purposes. Each such maintenance assessment shall be and constitute a lien upon the respective parcel or parcels of such owner from the due date thereof and the same shall remain and continue to be a lien thereon until fully paid.

Paragraph 19: For the purpose of further insuring the development of lands comprehended within HFA as a residential [sic] of high standards, the power to control buildings, structure or improvements placed on each lot or given land area therein shall be in the same as hereby invested in the HFA Property Owners Association and its successors. Approval must be granted by the Board of Governors. All outbuildings shall be similar in color and construction to the existing barns and buildings located on HFA.

Paragraph 23: The Restrictions and Agreements set forth herein are made for the mutual and reciprocal benefit of each and every parcel in HFA and are intended to create mutual, equitable servitudes upon each of said parcels in favor of each and all the other parcels therein; to create reciprocal rights between the respective owners of all said parcels; to create a privity of contract and estate between the grantees of said parcels, and their heirs, executors, administrators and assigns and shall, to the owner or owners of each said parcel their heirs, executors, administrators and assigns, operate as covenants running with the land for the benefit of each and all other parcels and their owners.

Paragraph 24: Any parcel owners to whose benefit these Restrictions insure may proceed at law or in equity to prevent the occurrence, continuation, or violation of any of these Restrictions and the Court in any such action may ward the successful party reasonable attorney's fee. The remedies specified herein are cumulative and a specification of them shall not be taken to preclude any aggrieved party from resorting to any other remedy at law or in equity of under any other statute. No delay or failure on the part of an aggrieved party to invoke an available remedy in respect to a violation of any of these Restrictions shall be held to be a waiver of that party or an estoppel of that part to assert any right available to him upon the recurrence of the continuation of such violation or the occurrence of a different violation.

Paragraph 25: These Restrictions may be amended by and with the written consent of no less than seventy-five percent (75%) of the owners of all the parcels in HFA. The owners of the various parcels shall have the power to waive, abandon, terminate, modify, alter, change, amend or add to these Restrictions or any of them at any time hereafter. Any such waiver, abandonment or addition shall take effect when a copy thereof executed and acknowledged by each of the parcel owners who assent thereto in accordance with the usual form of execution and acknowledgement of deeds to land, shall have been filed for record in the Office of the Record of Deeds, in and for Sussex County, and the same shall be waived, abandoned, terminated, modified, altered, changed, amended, or added to as the case may be. In the taking of any such vote, or the obtaining of any such written consent for each parcel or parcels that he may own in HFA.

Paragraph 27: The grantees are aware of an existing non-conforming use of one parcel of HFA which is currently operated as Booth & Sons. The grantees, their heirs, executors or assigns, shall have no objection to the rezoning of said parcel either by a conditional use or change of zone for commercial purposes to allow the zoning to conform to the current use of the property.[6]

Thereafter, on May 12, 1989, Booth conveyed 3.57 acres in Parcel B abutting the private road and Route 531 to Francis O'Marrow and his wife, who

---

[6] JTX 9.

were O'Marrow's parents.[7]  The Francis O'Marrows' deed contains the same 27 deed restrictions that are in their son's deed.  The Francis O'Marrows' parcel is located across the private road from the Mangones' parcel and has an additional 50 feet-wide easement running along its side and rear boundary lines.

On February 26, 1992, Booth conveyed 8.97 acres to Michael Deaton and his wife from the portions of Parcels A and B that were furthest from Route 531.[8] The Deatons' deed explicitly gave them the right of "ingress and egress over a 50 foot private road from the subject premises to Sussex County Road 53[sic]."[9]  This deed also contains the 27 deed restrictions.  On the same date, Booth conveyed Parcel B (specifically excepting the parcels owned by the Francis O'Marrows and the Deatons, and five acres that were about to be conveyed to Dr. Michael Metzler and his wife) to Margarette Jones, and Jones immediately reconveyed the land back to Booth, subject to the 27 deed restrictions, an additional restriction prohibiting trailers or mobile homes or other temporary structures of any kind on Parcel B, and a right of first refusal to the Deatons if any third party offered to buy the property.[10]

---

[7] JTX 11.
[8] JTX 12.
[9] *Id.*
[10] JTX 18.

On March 18, 1992, Booth conveyed a five-acre lot directly behind the Francis O'Marrows' property to Dr. Metzler and his wife.[11]  This new parcel contained the former "Booth & Sons" building where the glass and metal fabricating business had operated, which the Metzlers now wanted to use for a veterinary hospital.  Although the record is not clear, it appears that Booth's manufacturing building may have stood on a small parcel containing approximately one acre that had been carved out of Parcel B.  However, the Metzlers needed five acres under County regulations to operate a veterinary hospital, so Booth conveyed an additional four acres from Parcel B to the Metzlers.  The Metzlers' deed contains the same 27 restrictions, but the following sentence was added to Paragraph 27:  "Further, the five acres, more or less, tract herein conveyed is expressly exempted from the Restrictions to allow the use of that tract for a veterinary hospital or any other use permissible in an AR-1 Agricultural Residential District by the Planning and Zoning Commission for Sussex County."[12]  Because the existing building was too close to the Francis O'Marrows' property line, the Metzlers applied for a variance to the County's sideyard setback requirements.[13]  Their application was opposed by both O'Marrow families on the grounds that the veterinary hospital violated the deed restrictions, increased traffic

---

[11] JTX 16.
[12] *Id.*
[13] JTX 24.

on the private road, created excessive noise, and depreciated their property values.[14]  The variance was granted on July 27, 1992, with some conditions.[15]  On September 17, 1992, the Metzlers and the O'Marrows executed an "Agreement and Restrictive Covenants."[16]  Under the terms of this agreement, the O'Marrow families agreed to forego an appeal to the Superior Court from the variance approval and an action in this Court to challenge the deed restrictions in the Metzlers' deed in exchange for the Metzlers' agreement to abide by the conditions imposed by the Board of Adjustment and certain additional conditions imposed by the O'Marrow families, including the removal of a large sign from the building, and limitations on hospital's hours of operations.[17]

All of Booth's lands were now sold, with the exception of a parcel containing approximately 14.27 acres, located along Heritage Farm Road between the Metzlers' property and the Deatons' property.  On April 28, 1992, Booth obtained a building permit from the County allowing him to modify his barn on this parcel to create a small apartment within the existing structure.[18]  For several more years, Booth resided in this apartment inside the barn along with the horses in their stalls.  Booth subsequently built more structures on this 14.27 acre parcel,

---

[14] *Id.*
[15] JTX 26.
[16] JTX 2.
[17] *Id.*
[18] JTX 34.

including another barn, a six-bay garage, a turn-in shed, and a shop that was added to the rear of one barn. Although he obtained permits from the County.[19] Booth never sought or obtained permission from his neighbors in the community for these improvements. In time, Booth started a construction business and a landscaping business, and stored his commercial vehicles on this parcel. In November 2002, during a homeowners meeting, Booth was informed that he was out of compliance with the deed restrictions.[20] By this time, Booth was renting his parcel to Roles and his then-wife Margaret. A formal lease was executed in February 2003, in which the Roles were referred to the deed restrictions.[21] Roles is a horse trainer and farmer.[22] He had known Booth since 1993 when Booth was in the business of raising, showing, and breeding horses.[23] On October 29, 2004, Booth conveyed the 14.27 acre parcel to Margaret, subject to the 27 restrictions.[24] After their divorce, Margaret conveyed this parcel to Roles on January 22, 2010.[25] The deed between Margaret and Roles included no reference to any restrictive covenants.

---

[19] *Id.*
[20] JTX 70.
[21] JTX 20.
[22] Trial Transcript ("TT") 302.
[23] TT 312.
[24] JTX 17.
[25] JTX 19.

HFA was incorporated in 1990.[26] According to the certificate of incorporation, in order to be a member of HFA, one had to be a property owner in "Heritage Farms."[27] According to the deed restrictions that can be found in the deeds conveyed by Booth to all of the original property owners except the Mangones, the name of the community is "Heritage Farms Association" or "HFA," not "Heritage Farms."[28] These deed restrictions, moreover, require each property owner in the HFA to become a member of a homeowners association called "HFA Property Owners Association" that was to be governed by a Board of Governors. In reality, however, no formal HFA Property Owners Association was ever incorporated nor was a Board of Governors selected. There are no written bylaws or regulations governing this neighborhood other than the deed restrictions. Through the years, HFA has had only two elected officers, a president and a treasurer.[29] O'Marrow has been the treasurer since 1992.[30] The position of the president has changed many times. At the time of trial, the president was Jeremy Taylor, who with his wife had purchased the parcel formerly owned by Clarence "Skip" Gardner from his estate on November 2, 2012.[31] There was never an

---

[26] JTX 32.
[27] *Id.*
[28] JTX 9.
[29] TT 104.
[30] TT 98.
[31] TT 40; JTX 15.

official secretary, but minutes were usually recorded by the hostess in whose dwelling the homeowners meeting took place.[32]

Membership in this community fluctuated as properties were sold and also because the property owners were not always sure if they were part of HFA. The Mangones and Francis O'Marrows had access to their parcels from Route 531, and did not use Heritage Farm Road. In 1995, the Mangones subdivided their parcel in order to convey 1.5 acres to their son Jeffrey Alloway and his wife.[33] Because the Alloways' proposed parcel needed access to HFA's private road, Mangone and Alloway sought and were given permission for the Alloways to join HFA. According to the minutes of a homeowners meeting on January 8, 1995, the members present (O'Marrow and his wife, and Joseph Liefbroer and his wife, who were successors in interest to the Deatons) observed that the Alloways had been approved by the County to construct a dwelling that met the requirements and restrictions of HFA, and that all HFA restrictions would be attached to the deed conveying the property to the Alloways.[34] It appears from the record that the Mangones had been part of the community during the early years of HFA's existence because Mr. Mangone was copied on the meeting minutes and

---

[32] TT 104. The minutes in the record are incomplete, but in1995, the minutes were titled "Minutes of Meeting for HFA." JTX 61-62. Thereafter, they were titled "Heritage Farm Homeowners Association." JTX 63-78.
[33] JTX 3.

participated in maintaining HFA's entrance and private road, at least through February 1998.[35] At some later point in time, the Mangones were no longer considered part of the community, and on December 1, 2005, HFA rejected the Mangones' formal request to join the neighborhood by a vote of three of the four homeowners present (Alloway, Roles, O'Marrow, and Gardner, successor in interest to the Liefbroers).[36] Dr. Metzler was copied on some of the early minutes as well, but Dr. Metzler believed that he had been dismissed from HFA after he stopped using the private road and dug his own well, and so he stopped attending the meetings.[37]

During this time, as each parcel was sold by Booth or, like the Alloways, was subdivided from a larger parcel, new homes, garages and other buildings were erected in HFA. O'Marrow testified that when he bought his 9.5 acre parcel, there was already a large barn, a sun shelter and a run-in shed on it.[38] He subsequently built a house with attached garage, another run-in shed, and placed a manufactured utility shed on his property.[39] According to O'Marrow, when he built his second run-in shed, he first had asked permission of Booth, and when O'Marrow put the

---

[34] JTX 61. In fact, the 27 deed restrictions were not included by reference in the Alloways deed until 2008. JTX 4B.
[35] JTS 61-65.
[36] JTX 72.
[37] TT 29-30, 39.
[38] TT 66-67.
[39] TT 78-79.

utility shed on his property, he made Booth and Liefbroer aware of what he was doing and they had no problems with his plan.[40] O'Marrow conceded that Booth did not ask permission of any other property owner when he built more run-in sheds on his 14.27 acre parcel (before Booth sold this parcel to Margaret Roles), but O'Marrow also testified that Booth informed other property owners that he was building a large garage to house his farm tractors, and no one had any concerns.[41] Dr. Metzler added two accessory structures to his property without seeking any of his neighbor's permission, but O'Marrow explained that the HFA undertook no enforcement action because Dr. Metzler's structures conformed to the rest of the community in color and type.[42] Alloway placed a prefabricated shed on his property without seeking anyone's permission, but when he built a two-story garage he went to his neighbors out of politeness to tell them what he was planning on building.[43] Alloway also testified that when Booth lived on the road, Booth had expressed concerns about structures the other neighbors were putting on their lands while the other neighbors had concerns about what Booth was building.[44]

There was a meeting of homeowners on March 4, 2007. Only O'Marrow and his wife, Gardner, and Roles were present. Roles was told that the horsing

---

[40] TT 180, 185.
[41] TT 187-189.
[42] TT 189.
[43] TT 158-161.
[44] TT 164.

training business he was operating on Heritage Farm Road was a violation of the deed restrictions and was causing excessive traffic on the private road.[45] According to the minutes taken by O'Marrow's wife, Roles became very upset. On June 26, 2007, HFA, Inc. filed a complaint in this Court to enforce the deed restrictions against the Roles.[46] After the O'Marrows, the Gardners, and the Alloways were joined as plaintiffs, the parties entered into a settlement agreement on October 14, 2008.[47] Under the agreement, the Roles agreed to pay the HFA $750.00 as an annual assessment while the other parties would pay $250.00 as an annual assessment to be applied to the maintenance of Heritage Farm Road. The parties agreed that an accounting would be prepared annually by HFA for all expenditures made to maintain the common road. The Roles agreed that no delivery of horses to their property would be made after 9:00 p.m., except their own horses, and that there should be no more than 15 horses owned by persons other than the roles on the Roles' property. The parties agreed that the Roles might continue to use their property for equestrian activities, including the training, boarding, and breeding of horses, and that such activity would not be a violation of the deed restrictions. The parties also "agree[d] to attempt to negotiate in good faith a set of restrictive covenants for the Heritage Farms subdivision that are

---

[45] JTX 75.
[46] *HFA, Inc. v. Roles*, C.A. No. 3053-MG (Del. Ch.). JTX 21.
[47] JTX 21.

mutually agreeable and compatible with the uses made by the parties for the two (2) years preceding the filing of the Law Suit."[48]

It appears that Roles requested accountings from HFA for expenditures made for the maintenance of the Heritage Farm Road, but he received no information. In a letter dated March 29, 2010, Roles' attorney demanded that HFA provide accountings for the years 2007 through 2010.[49] By letter dated April 9, 2010, O'Marrow provided a list of the cash disbursements for the common road from October 14, 2008 through March 30, 2010, which totaled $972.64.[50] Further correspondence requesting the road maintenance expenditures for 2007 and 2008 was met with the following response by O'Marrow: "Our records indicate that your client Mr. Dean Roles was not a property owner during this period. It is our policy to only share our financial information with members in good standing."[51]

By letter dated April 1, 2011, Roles, through his attorney, informed HFA that he would no longer be contributing $750.00 as an annual assessment, only the $250.00 paid by other lot owners, as a result of HFA's continuing breach of the terms of the Settlement Agreement by (1) failing to produce annual accountings to Roles, (2) constructing improvements on the common road without the unanimous consent of the members of the HFA, and (3) failing to negotiate or even propose a

---

[48] *Id.*
[49] JTX 107.
[50] JTX 109.

new set of restrictions.[52] A check for $250.00 was included with this letter, but the check was never cashed.

## Procedural Background

On August 25, 2011, O'Marrow and Gardner filed this action seeking to enjoin Roles from: (a) expanding his equestrian business beyond the terms of the settlement agreement; (b) constructing a large accessory building on his property without prior approval from the HFA; and (c) expanding his easement over Heritage Farm Road as a result of the increased equestrian business on his property. Alternatively, O'Marrow and Gardner sought specific performance of the Settlement Agreement, reformation of the Settlement Agreement, and shifting of attorney fees. Initially, plaintiffs unsuccessfully sought a temporary restraining order to stop the construction of the barn. Roles later moved for summary judgment, asserting that the plaintiffs were barred by the doctrines of *res judicata* and collateral estoppel, and the equitable doctrine of unclean hands. In a draft report to which no exception was taken, I recommended that the Court grant Roles' motion for summary judgment in part as to the use of his property since the plaintiffs had bargained away their right to complain against Roles' equestrian

---

[51] JTX 110.
[52] JTX 108.

business except as to the hours of delivery and the number of horses.[53] However, I found that the plaintiffs were not precluded as a matter of law from bring their claim regarding Roles' construction of a large accessory building without prior approval from HFA and that material questions of fact existed whether the plaintiffs had unclean hands that precluded relief.[54] Before this matter could go to trial, however, Gardner passed away, leaving O'Marrow as the sole plaintiff.

## Issues

O'Marrow argues that the deed restrictions are enforceable, and that Roles had both actual and constructive notice of the requirement of prior approval and of the standards governing the construction of accessory structures and outbuildings in the HFA. According to O'Marrow, there are two different standards, as reflected in paragraphs 6 and 19 of the deed restrictions. The first standard (found in paragraph 6) applies to accessory buildings, which are allowed with the following limitations: (1) one accessory structure per lot; (2) the accessory structure shall be one story in height; and (c) the accessory use must be in connection with the single family dwelling. He describes garages, pool houses, and utility sheds as falling within the category of accessory structures. The second standard (found in paragraph 19) applies to outbuildings, which O'Marrow argues

---

[53] JTX 56-57. *O'Marrow v. Roles*, 2013 WL 3752995 (Del. Ch. July 15, 2013) (Master's Draft Report).
[54] *O'Marrow v. Roles*, 2013 WL 3752995, at *7.

are different from accessory structures because they are not related to the dwelling *per se,* but have other functions. O'Marrow describes barns, run-in sheds, and sun shelters as outbuildings and argues that any new outbuilding must be similar in color and construction to the existing outbuildings in the HFA. Until the erection of the new barn at issue, the existing outbuildings in the HFA were all pole buildings, i.e., framed with wood, sided with ribbed metal panels that were painted barn red,[55] and covered with either ribbed metal panels painted white or white asphalt tiles. These include Roles' barns, six-bay garage, turn-in sheds, and sun shelter, O'Marrow's two-story barn, run-in sheds and sun shelter, and Dr. Metzler's veterinary hospital and two sheds. O'Marrow describes Roles' new barn as enormous, more than twice the size of any other outbuilding in the HFA, and because it is framed with steel beams and covered with fabric, he contends that Roles' barn violates the standard for outbuildings. O'Marrow argues that paragraph 19 of the deed restrictions is akin to language requiring visual harmony found in covenants that were upheld by this Court in other cases, specifically citing *Dolan v. Villages of Clearwater Homeowners Assoc., Inc.*,[56] and is enforceable. O'Marrow also denies that the HFA ever breached the settlement agreement.

---

[55] At trial, O'Marrow described the red color of Roles' new barn as "Chinese red" instead of the barn red color used on the other buildings. TT 148.
[56] 2005 WL 2810724 (Del. Ch. Oct. 21, 2005).

Instead, O'Marrow accuses Roles of breaching the agreement by not paying his annual assessment of $750.00.

Roles acknowledges that he had actual and constructive notice of the deed restrictions, but he argues that, as part of the previous settlement agreement between the parties, O'Marrow had an obligation to make a good faith attempt to agree on a set of revised restrictions that would allow the parties to continue to use their properties as they had been for the previous two years, which he failed to do. Now, Roles argues that these restrictions are unenforceable for numerous reasons. First, Roles argues that there is a lack of uniformity since not all parcels within HFA are burdened with the same deed restrictions. Second, he argues that the restrictions and the process for approval have been unevenly applied to the residents of HFA. According to Roles, many of the parcels in HFA have more than one accessory structure and the requirement of prior architectural approval has been waived because many of the property owners, including Roles, have placed or modified multiple accessory structures on their properties without seeking prior approval. Roles contends that the language of paragraph 19 is too vague and ambiguous to be enforceable because there are many ways the language could be interpreted. He argues, moreover, that not only is the phrase "visual harmony" absent from the deed restrictions, but also there is no coherent visual style within the neighborhood. According to Roles, the deed restrictions applying to structures

in paragraphs 6, 12, and 19 are so contradictory that they fail to create an unambiguous, objective, non-arbitrary set of standards that are capable of even-handed enforcement. Roles also claims that O'Marrow lacks standing to bring this action because his wife, with whom he owns the property in HFA as tenants by the entirety, did not join him as a plaintiff in this action, citing *Henderson v. Chantry*,[57] in support of his argument. Finally, Roles argues that the covenants no longer serve a purpose in the HFA since none of the present property owners in HFA, other than O'Marrow, has any concern about his new barn.

In reply, O'Marrow argues that the deed restrictions are enforceable by implication and by a common plan of development since Booth intended to create a binding and restrictive covenant on all the properties in the HFA. Moreover, the fact remains that both O'Marrow and Roles have the same relevant restrictions in their deeds which, according to O'Marrow, are based on objective standards, i.e., the buildings that were in existence in 1988 when Booth first conveyed a deed containing the 27 deed restrictions. O'Marrow also argues that Roles is barred from raising the issue of plaintiff's standing because Roles failed to raise it as an affirmative defense in any previous pleading. Finally, he contends that *Henderson*, the case on which Roles relies, is inapposite here because it involved a

---

[57] 2002 WL 244692 (Del. Ch. Feb. 5, 2002).

husband/landowner who was giving up a property right, not one who was seeking to enforce a restrictive covenant.

Analysis

This is another case demonstrating the tension that arises when a neighboring landowner's expectations for his community conflicts with the desires of another landowner to use his property as he may lawfully choose.[58] Both properties in question here appear to be subject to substantially the same restrictive covenants in their deed or chain of title. The presence of these restrictions, which touch and concern the land:

> calls into question competing legal interests. One is the right of a willing buyer and willing seller to enter into a binding contract. The other competing interest is the special nature of land, which has historically been permitted free use. The courts have sought to harmonize these competing interests by developing special guidelines as to the enforcement of restrictive covenants and the rule has evolved that "while the law favors the free use of land and frowns on restrictive covenants, they are recognized and enforced … where the parties' intent is clear and the restrictions are reasonable."[59]

A restriction, like the one in paragraph 19 of the O'Marrows' deed, requiring a property owner to obtain prior approval of a homeowners association or a committee thereof, before making any improvements to the land is commonplace

---

[58] *The Greylag 4 Maintenance Corp. v. Lynch-James*, 2004 WL 2694905, at *5 (Del. Ch. Nov. 18, 2004).

[59] *Id.* (quoting *Chambers v. Centerville Tract No. 2 Maintenance Corp.*, 1984 WL 19485, at *2) (Del. Ch. May 31, 1984)).

in planned subdivisions or developments.[60] "However, architectural review is suspect due to its tendency to be arbitrary, capricious, and therefore unreasonable."[61] In order to be upheld, the power of architectural review must be exercised reasonably, and any doubt as to its reasonableness must be resolved in favor of the landowners.[62]

Several challenges have been raised by Roles to the overall enforcement of the deed restrictions in light of the history of the development of this community. O'Marrow has responded to these challenges by arguing that the fact that Booth subjected his own property, through a straw-conveyance in 1992, to the same deed restrictions as were placed on every other out-conveyance with two exceptions (the Mangones and the Metzlers), is strong evidence of Booth's intent to create a planned development. Secondly, O'Marrow argues that the explicit written language in his deed and Roles' chain of title reflects the intent of the grantor and grantee to create a restrictive covenant, with each party bearing the same burden on their land and each having the right to enjoin a breach of such restrictions by the other.

Booth did not testify at trial. However, the evidence strongly suggests that it was not Booth's intent to create a planned development along the lines that

---

[60] *Seabreak Homeowners Assoc. v. Gresser*, 517 A.2d 263, 268 (Del. Ch. 1986).
[61] *Id.*
[62] *Id.*

O'Marrow now describes. According to Dr. Metzler, Booth simply wanted to sell his land, and so he promised people whatever they wanted to hear.[63] Booth's first conveyance was to the Mangones, and their deed contains only five restrictions. However, it appears that O'Marrow wanted more protection for the property he was about to purchase for his retirement home and horse farm. According to his testimony, O'Marrow understood that Booth intended to sell all his land and O'Marrow claims to have seen a plan showing Booth's property divided into six lots.[64] O'Marrow then worked with Booth to develop the 27 restrictions that were placed in O'Marrow's deed, and was assured by Booth that the same deed restrictions would be placed on the other lots.[65] These same 27 restrictions were included in the 1989 deed to O'Marrow's parents. In 1992, shortly before Booth sold the five acres of land to the Metzlers, he conveyed 8.97 acres to the Deatons, who apparently wanted a right of first refusal on Booth's remaining available lands, i.e., the parcel containing 14.27 acres that Roles later purchased. On the same day Booth conveyed 8.97 acres to the Deatons, Booth conveyed the 14.27 acres to Jones, in a straw-conveyance whereby Jones immediately reconveyed the 14.27 acre parcel to Booth. Not only did the Deatons' deed include the 27 restrictions, but Booth's new deed to the 14.27 acres now included the 27 deed

---

[63] TT 19.
[64] TT 62-63.
[65] TT 87-89.

restrictions, the Deatons' right of first refusal, and a covenant concerning a commission for the Deatons' broker. However, Booth's later actions demonstrate that he never intended to be bound by these 27 deed restrictions because he started to operate two commercial businesses on his 14.27 parcel. When Booth conveyed the five acres to the Metzlers, he also never intended the Metzlers to be bound by the 27 deed restrictions because their deed explicitly allowed the Metzlers' parcel to be used for a veterinary hospital and any other permitted use in the County's AR-1 zoning district, in total contravention of several other restrictions limiting or pertaining to the use of the property solely and exclusively for residential purposes.

Booth had concerns about what his neighbors were building on their properties,[66] but there is no evidence that Booth ever sought to enforce any deed restriction against other property owners in the HFA while he lived there. Instead, the record shows that it was always O'Marrow who sought to enforce the deed restrictions. The first instance occurred when the two O'Marrow families invoked the deed restrictions in opposing the Metzlers' application for a variance and in threatening to file an enforcement action in this Court. The end result was that additional restrictive covenants were imposed on the Metzlers' property, running with the land for as long as it is used for a veterinary hospital. The second time occurred during a homeowners meeting at O'Marrow's house on November 17,

---

[66] TT 164.

2002, when Booth was asked to terminate the use of his 14.27 acre parcel for his landscaping and construction businesses, and O'Marrow's wife was given the authority to contact the County to investigate the matter.[67] The end result was that the County became involved, and Booth shortly thereafter sold the 14.27 parcel to Roles' wife and left the neighborhood. The third time occurred when O'Marrow and Gardner, acting on behalf of HFA, Inc., brought suit in this Court to enforce the deed restrictions against Roles for operating a horse training and boarding business on the 14.27 acre parcel.[68] The end result was that additional restrictions were imposed on Roles' use of his land by a settlement agreement. Although the individual property owners who had access to the private road were added as plaintiffs and joined in the stipulation and settlement, the pattern is clear. The development of this neighborhood owes as much, if not more, to O'Marrow as to Booth, the original grantor. O'Marrow appears to have crafted the 27 deed restrictions, albeit jointly with Booth, and then through threatened or actual enforcement actions against his neighbors, has controlled the neighborhood. Ironically, at the same time O'Marrow was using his own parcel in HFA as the base for his small commercial horse breeding and horse racing business.[69]

---

[67] JTX 70.
[68] JTX 74.
[69] TT 263-264, 273.

As shown above, the deed restrictions and the history of the development of this neighborhood are problematic, but the fact remains that paragraph 19 of the Booth to O'Marrow deed is, like paragraph 19 in the deed from Jones to Booth, which is in Roles' chain of title, is a covenant that touches and concerns the land and O'Marrow and Roles appear reciprocally bound by this deed restriction. It is undisputed that Roles did not request anyone's approval before he built the new barn on his property. Nor had Roles asked anyone's approval when he previously erected three new run-in sheds and a dog kennel on his property. Roles now argues that the neighborhood has never enforced this restriction against him or other property owners who also made improvements to their properties without seeking prior approval and, therefore, this restriction has been waived, if not abandoned completely, by the HFA. It is not necessary for me to address this argument because, assuming the architectural review restriction has not been waived or abandoned, paragraph 19 is too vague, unclear, and ambiguous to be enforced.

Paragraph 19 states:

> For the purpose of further insuring the development of lands comprehended within HFA as a residential [sic] of high standards, the power to control buildings, structure or improvements placed on each lot or given land area therein shall be in the same as hereby invested in HFA Property Owners Association and its successors. Approval must be granted by the Board of Governors. All outbuildings shall be similar in color and construction to the existing barns and buildings located on HFA.

Aside from the fact that there currently exists no Board of Governors, this covenant contains no specific method or procedure for obtaining approval from the Board of Governors.[70] There is no application process outlined in the covenant, such as the requirement of the submission of written plans to the Board of Governors. Nor does this covenant dictate the method by which the Board would reach a decision on an application. Under paragraph 17(d), the Board of Governors may consist of no fewer than two property owners in HFA. If there was a tie vote, paragraph 19 does not state whether the application would be deemed approved or denied.

More problematic is the fact that approval power is based on the Board of Governors determining whether the outbuildings are "similar in color and construction to the existing barns and buildings located on HFA." O'Marrow argues that this standard is an objective one because all of the other outbuildings on HFA reflect a red and white color motif, and consist of wooden pole buildings, with metal siding and roofs covered with metal or asphalt shingles. Citing *Dolan*, O'Marrow argues that anyone looking at the community would see the standards for construction used for the outbuildings in HFA. However, even if I were to accept O'Marrow's argument that there are two different standards, one for accessory structures and another for outbuildings, there is no covenant requiring

visual harmony in paragraph 19 or elsewhere in the deed restrictions. Furthermore, there is no explicit limitation on the size of any outbuilding or on the types of construction materials to be used for outbuildings in the deed restrictions.

Roles reviewed paragraphs 16 and 19 of the deed restrictions, and with these in mind, he constructed a one-story barn with a white and red color motif, and with metal framework angled in a way that resembled the Dutch-style roof on O'Marrow's two-story barn.[71] Roles understood the word "construction" as meaning the style or silhouette of the building, not the materials with which it was made.[72] His interpretation is not an unreasonable one, given that Webster's Third New International Dictionary contains the following definition of "construction" as: "2a: The act of putting parts together to form a complete integrated object: FABRICATION; b(1): The form or manner in which something has been put together: DESIGN; (2): The science or study of building or erection; c: Something built or erected: STRUCTURE."[73]

O'Marrow, on the other hand, would have the Court read into the word "construction" in paragraph 19 limitations on both the size of an outbuilding and the types of materials used in constructing an outbuilding. However, when

---

[70] *Daweiko v. Grunewald*, 1988 WL 140225, at *5 (Del. Ch. Dec. 27, 1988).
[71] TT 334, 363-374.
[72] TT 366-367.
[73] Webster's Third New International Dictionary, Unabridged (2002 Merriam-Webster, Inc.).

construing deed restrictions, "where the meaning of a restriction is doubtful, the doubt shall be resolved in favor of the grantee."[74] Therefore, it cannot be said that Roles' new barn violates the standard found in paragraph 19. The architectural review provision in paragraph 19, which leaves to the discretion of a Board of Governors the determination whether the color or construction of an outbuilding is "similar" to existing barns or buildings in HFA, is too vague and imprecise to be enforceable.[75]

A final issue remains to be resolved regarding O'Marrow's request for specific performance of the October 14, 2008 settlement agreement, which he claims was beached by Roles. By letter dated April 1, 2011, Roles informed HFA that he would no longer pay the $750.00 assessment because of HFA's continuing breach of the agreement and, instead, proferred $250.00 as his assessment.[76] O'Marrow previously had refused to convey additional financial information to Roles for the stated reason that it was HFA policy not to disclose financial information to persons who were not owners in good standing. O'Marrow's rationale was specious; HFA has no written by-laws or policies and Roles had been

---

[74] *Daniels Gardens, Inc. v. Hilyard*, 49 A.2d 721, 723 (Del. Ch. 1946).

[75] *See Benner v. Council of the Narrows Assoc. of Owners*, 2014 WL 7269740, at *11 (Del. Ch. Master's Final Report) (suggesting that the "substantially similar to the original construction" standard was unenforceable). See generally, *People v. Mazzochetti*, 696 N.Y.S.2d 618, 622 (1998) (voiding town statute applicable to "fences, walls, and any other similar construction," as unconstitutionally vague and indefinite).

actively participating in homeowners meetings for years before he became the property owner. Now, O'Marrow argues that the settlement agreement was intended to require only future accountings. As reflected in the April 1, 2011 letter, Roles contends that O'Marrow failed to make any good-faith effort to revise the deed restrictions. In response, O'Marrow argues that he was but one of several homeowners who would have had to agree to revisions. During the trial, O'Marrow testified that there was a homeowners meeting after the settlement agreement to discuss possible revisions to the restrictions, but since Roles failed to attend after being given notice, the owners present voted unanimously not to amend the restrictions.[77] Roles denied that he had been given notice of a meeting to address the restrictive covenants.[78] The other parties to the settlement included Mrs. O'Marrow, the Alloways and Gardner. Gardner is deceased. Neither Mrs. O'Marrow nor the Alloways have joined with O'Marrow in seeking specific performance of the settlement agreement. I find Roles to have been the more credible witness and, therefore, I conclude that it was O'Marrow and the other parties, not Roles, who breached the settlement agreement by failing to negotiate in good faith to revise the deed restrictions. Therefore, O'Marrow is not entitled to specific performance.

---

[76] JTX 110.

[77] TT 133-136.

[78] TT 308.

## Conclusion

To obtain a permanent injunction forcing Roles to remove his new barn, O'Marrow must show: (1) actual success on the merits of the claims; (2) that the plaintiff will suffer irreparable harm if injunctive relief is not granted; and (3) that the harm to the plaintiff outweighs the harm to the defendant is an injunction is granted. I find that O'Marrow has failed to demonstrate success on the merits of his claim. Therefore, I recommend that the Court deny O'Marrow's request for a permanent injunction forcing Roles to remove his barn from his property, deny O'Marrow's request for specific performance, and deny O'Marrow's request for attorney's fees.

I have reviewed Plaintiff Garnet O'Marrow's exceptions to my draft report recommending the denial of Plaintiff's request for (a) a permanent injunction forcing Defendant Dean P. Roles, Jr. to remove the barn from his property, (b) specific performance of the settlement agreement, and (c) attorney's fees. None of Plaintiff's arguments persuades me that I was mistaken in my factual finding that O'Marrow was the first party to breach the settlement agreement or that I erred in concluding that the restrictive covenant was too vague and imprecise to be enforceable. Therefore, I am adopting my draft report as my final report. The

parties are referred to Court of Chancery Rule 144 for taking exception to a Master's Final Report.

Respectfully,

/s/ Kim E. Ayvazian

Kim E. Ayvazian
Master in Chancery

KEA/kekz
cc:    Dean A. Campbell, Esquire
       John A. Sergovic, Jr., Esquire